STATE OF LOUISIANA

VERSUS

JOHN W. PATTON

NO. 22-KA-112

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 18-7474, DIVISION "J"
HONORABLE STEPHEN C. GREFER, JUDGE PRESIDING

December 21, 2022

**ROBERT A. CHAISSON**
**JUDGE**

Panel composed of Judges Marc E. Johnson,
Robert A. Chaisson, and Stephen J. Windhorst

<u>**AFFIRMED AND REMANDED**</u>
    **RAC**
    **MEJ**
    **SJW**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Alexis Barteet
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
    Honorable Paul D. Connick, Jr.
    Thomas J. Butler
    Monique D. Nolan
    Zachary P. Popovich
    Laura S. Schneidau

COUNSEL FOR DEFENDANT/APPELLANT,
JOHN W. PATTON
    John W. Patton
    Prentice L. White

**CHAISSON, J.**

Defendant, John W. Patton, appeals his convictions and sentences for attempted second degree rape, false imprisonment while armed with a dangerous weapon, second degree rape, and sexual battery. Defendant's appellate counsel has filed a brief asserting that the trial court violated defendant's right to due process by allowing him to represent himself but not ensuring that he had the appropriate equipment and resources to adequately prepare a defense for trial. Defendant has also filed a *pro se* brief raising thirteen assignments of error. Having thoroughly reviewed the appellate court record, the briefs submitted by the parties, and the applicable law, we find no merit to the arguments raised by defendant and his appellate counsel. Accordingly, for the reasons that follow, we affirm defendant's convictions and sentences; however, we remand the matter for correction of an error patent as noted herein.

## STATEMENT OF THE CASE

On November 30, 2018, the Jefferson Parish District Attorney filed a bill of information charging defendant with attempted second degree rape, in violation of La. R.S. 14:27 and 14:42.1 (count one); false imprisonment while armed with a dangerous weapon, in violation of La. R.S. 14:46.1 (count two); second degree rape, in violation of La. R.S. 14:42.1 (count three); and sexual battery, in violation of La. R.S. 14:43.1 (count four). Defendant pled not guilty to the charged offenses.

During the course of pre-trial proceedings, defendant requested to represent himself. On October 9, 2019, after a hearing, the trial court granted defendant's request to represent himself and appointed the Public Defender's Office as standby counsel. Following the resolution of numerous pre-trial motions, the matter proceeded to trial before a twelve-person jury on April 12, 2021. After considering

the evidence presented, the jury, on April 21, 2021, unanimously found defendant guilty on all four counts.

Defendant thereafter filed a motion for new trial and motion for appeal. On May 14, 2021, the trial court denied defendant's motion for new trial and granted his motion for appeal. Thereafter, on May 19, 2021, the trial court sentenced defendant to imprisonment at hard labor for fifteen years on count one, ten years on count two, thirty-five years without benefit of parole, probation, or suspension of sentence on count three, and ten years without benefit of parole, probation, or suspension of sentence on count four. The trial court ordered that counts two, three, and four be concurrently served "with one another" and consecutively served to count one.

Defendant's appeal was subsequently lodged in this Court. On November 17, 2021, this Court observed that upon granting defendant's motion for appeal on May 14, 2021, the trial court was without jurisdiction to subsequently sentence defendant on May 19, 2021. In light of its finding that defendant's motion for appeal was prematurely granted before sentencing, this Court vacated defendant's sentences and remanded the matter for resentencing on all four counts. *See State v. Patton*, 21-613 (La. App. 5 Cir. 11/17/21), 347 So.3d 1070.

On December 6, 2021, the trial court sentenced defendant to the same terms of imprisonment previously imposed. In addition, the trial court ordered defendant to comply with the sex offender registration requirements. Defendant thereafter filed a motion for appeal. On December 16, 2021, the trial court granted the appeal and appointed the Louisiana Appellate Project to represent defendant.

## **FACTS**

It is initially noted that count one pertains to an incident involving R.D. that occurred on October 29, 2016, and counts two, three, and four pertain to incidents

involving J.M. that occurred on September 7 and 8, 2018.[1]  Both victims testified

at trial as to their encounters with defendant.  In addition, numerous police officers

testified regarding their involvement and investigation in the cases, and expert

witnesses testified regarding their examination and analysis of the evidence

received.  Defendant also testified at length regarding his version of the events.[2]

At trial, J.M. testified that she met defendant on a dating website in late

August or early September of 2018.  After initially communicating through text

messages and phone calls, the two decided to meet in person on September 7,

2018.  As J.M. was getting ready to leave her house for the date, defendant sent her

a text canceling the date because he had to go pick up his sister from "across the

lake."  However, later that evening, defendant texted J.M. that he was back home

with his sister and invited her over to his house located on Central Avenue in

Westwego.  J.M. accepted the invitation and arrived at defendant's house at

approximately 9:45 p.m.

Once J.M. entered the home, defendant locked the front door, and after

exchanging greetings, told J.M. to come meet his sister, who was in the bedroom.

J.M. explained that she followed behind defendant, and that as she approached the

doorway, she noticed that no one was in the bedroom.  At this point, J.M. realized

that defendant's sister was not in the house.  She became uncomfortable and

attempted to leave after defendant suggested that they lie down together.  J.M.

relayed that she walked quickly to the front door in the living room but could not

unlock it because defendant put his hands around her mouth and pulled her away

from the door.

---

[1] In the interest of protecting victims of sexual offenses as set forth in La. R.S. 46:1844(W)(3), this Court will use only initials when referring to the victims in this case. *State v. Moore*, 16-644 (La. App. 5 Cir. 3/15/17), 215 So.3d 951, 955 n.1.

[2] While this opinion sets forth a condensed version of the evidence presented, this Court has thoroughly reviewed the record in this matter and is fully aware of all the facts in this case as presented through the testimony of witnesses and evidence introduced at trial.

J.M. attempted to get away from defendant, and the two began fighting in the living room. J.M. struggled to breathe but managed to get defendant's hands off her and scream for help. J.M. recalled that she somehow got into his bedroom where the struggle continued. J.M. testified that she almost lost consciousness in the bedroom but was able to pull defendant's hands away and scream for help. During this fight, J.M. lost her keys and phone. At some point, J.M. ran out of the bedroom and made it to the bathroom.

As defendant started coming at her, she told him to stop and asked him if he was doing this because he wanted to have sex with her. When he replied affirmatively, J.M. complied with his demand for sex out of fear. She testified that she thought defendant was trying to kill her, that she did not want to have sex with defendant, and that she did nothing to lead him to believe she would consensually have sex with him.

Once back in the bedroom, defendant digitally penetrated J.M.'s vagina. After he removed his fingers, defendant tried to insert his penis into her vagina but was unable to get an erection. Defendant then performed oral sex on J.M. and had J.M. perform oral sex on him. Unable to get an erection, defendant then watched pornography on his computer as J.M. performed oral sex on him. In another attempt to escape, J.M. decided to bite defendant's penis as hard as she could. Defendant jumped up and screamed, giving J.M. an opportunity to run to the front door.

As she reached the door, defendant put his hands on her and prevented her from escaping. J.M. used a nearby end table to barricade herself into a corner of the living room. During this time in the living room, the two fought periodically, with defendant trying to put his hands around her mouth and suffocate her. Defendant also approached her with two different knives during the course of this ordeal. J.M. explained that she grabbed the knives with both hands in an attempt

to get them away from defendant. Further, J.M. testified that defendant continued to ask her for sex.

According to J.M., when the sun started to rise, defendant looked around the house and asked her what had happened. J.M. told him that he did it, which he denied. Finally, at around 7:30 a.m. on September 8, 2018, defendant began telling J.M. that she needed to go home. He eventually returned her personal items, including her pants, phone, and keys, unlocked the front door, and allowed her to leave the house at 8:30 a.m.[3] J.M. ran to her car and drove around the area trying to locate her friend's house. After she was unable to remember the location, she called a high school friend, Lieutenant Jason Hippler, who was a Jefferson Parish police officer. Lieutenant Hippler told J.M. to call 9-1-1.

After calling her ex-husband to explain why she had not picked up her daughter as planned, J.M. called 9-1-1 and reported that she had been attacked and held captive overnight. She subsequently met with Officer Samuel Norton of the Westwego Police Department in the parking lot of a Waffle House. As J.M. gave the officer some preliminary information about what had transpired, EMS arrived and transported her to Tulane-Lakeside Hospital, where a sexual assault examination was performed and photographs were taken. In addition, while at the hospital, J.M. was interviewed by detectives and gave a statement.

Based on the statement given by J.M., the officers obtained a search warrant for defendant's residence. Officers arrived at the residence, knocked on the door, and attempted to make contact with defendant. When the officers' communication attempts failed, power to the residence was cut, and CS gas was deployed to get defendant to exit. Defendant eventually exited the back of the residence, at which point he was advised of his rights and transported to the Westwego Detective Bureau. Once there, Detective Fisher took a recorded statement from defendant, in

---

[3] J.M. testified that she left her underwear and shoes in defendant's house.

which defendant claimed he had been drugged. Defendant was subsequently arrested and charged with second degree rape, false imprisonment while armed with a dangerous weapon, and sexual battery of J.M.

Thereafter, Detective Fisher, along with other officers, went back to defendant's residence to execute the search warrant. Photographs were taken during the search of the residence, and several items were recovered, including sheets, a blue towel with a red substance on it from the living room, the victim's underwear, and a pair of "black high-tops" identified by the victim. Detective Fisher observed several knives inside the residence but did not collect any because they did not have a blood-like substance on them.

Detective Fisher was later contacted by R.D., an ex-girlfriend of defendant. R.D. became aware of the Westwego incident after defendant was arrested, and at that point, decided to contact police. R.D. met with Detective Fisher on September 18, 2018, and advised him that a similar incident happened to her in Kenner in 2016.

At trial, R.D., the victim in count one, testified that she met defendant through an online dating website in July of 2016 and was involved in a romantic relationship with him until October 29, 2016. On that date, even though the two were having problems and planned on ending their relationship, they decided to go to a Halloween event together because they had already bought the tickets and the costumes. When they returned to her apartment at approximately 11:00 p.m., defendant wanted to go into the bedroom and have sex. R.D. refused, and a verbal argument ensued. Thereafter, defendant grabbed R.D.'s wrist and pulled her into the bedroom, as her daughter slept on the sofa. R.D. told defendant to stop, but defendant closed the door and threw her on the bed. He then got right behind her, pulled down her underwear, and attempted to penetrate her with his penis, but was not erect. As he was unsuccessfully trying to penetrate her, he accused her of

being a cheater and a whore. She lay there crying and told him to get out of her apartment. Defendant eventually left after R.D. threatened to call the police. At trial, R.D. testified that she did not call the police to report the incident because she did not want the embarrassment of reporting a rape. However, she ultimately decided to report the incident after she learned of J.M.'s allegations of rape against defendant. After her statement to police, defendant was arrested and charged with attempted second degree rape.

At trial, defendant testified in his own behalf. With regard to R.D., defendant acknowledged that he went to a Halloween event with R.D. and her daughter on October 29, 2016. He claimed that they had a great night and that they went home and drank; however, he stated that R.D. was being evasive about sex. When he asked her about it, R.D. said that she needed to clean the kitchen. Defendant testified that they eventually had sex, but after about five minutes, he realized something was not right. Defendant then got up, got dressed, and told R.D. he was leaving because he thought she was cheating on him with one of his co-workers. According to defendant, the two argued, and then he took his things and left.

With regard to J.M., defendant recounted that he was excited to meet J.M. for the first time on September 7, 2018; however, he texted J.M. to cancel the date after his sister called him. When defendant later pulled up at his house, he was thirsty and grabbed a water bottle from one of the coolers in the back of his truck that he used for work. After he drank the water, he felt "weird" and thinks he lost consciousness. Defendant guessed that he texted and called J.M. but claims he was "not operating with [his] mind." Defendant went in the house, and J.M. came over. Defendant relayed that all he remembered was her getting to the door and the two of them fighting in the living room. After that, defendant stated he went "kind of dark," and that when he came back to consciousness, he observed J.M. in the

corner, fully dressed, sitting behind the table.  Defendant noted that J.M. looked scared and that her keys and phone were on the table.  When defendant questioned J.M., she replied that he went crazy and tore up the house.  During his testimony, defendant maintained he was drugged, and that he did not know who drugged him on September 7 or any of the previous times that he claimed to have been drugged.  Defendant recalled during his testimony that in August, he became violently ill after drinking a water bottle out of the back of his truck while at work.  During his testimony, defendant also commented that he was framed and that the police planted evidence at his house.

## COUNSELED ASSIGNMENT OF ERROR
### *Right of Pro Se Representation*

On appeal, defendant's appellate counsel contends that the trial court violated defendant's due process rights and committed reversible error when it permitted him to represent himself at trial but did not ensure that he had sufficient equipment and resources to properly conduct his defense at trial.

In *State v. Perry*, 17-567 (La. App. 5 Cir. 6/27/18), 250 So.3d 1180, 1191, *writ denied*, 18-1325 (La. 11/14/18), 256 So.3d 285, this Court stated the following about a defendant's right to self-representation:

> The Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution give a defendant the right to counsel as well as the right to defend himself.  A defendant may represent himself only if he makes an unequivocal request to represent himself and knowingly and intelligently waives his right to counsel. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *State v. Bruce*, 03-918 (La. App. 5 Cir. 12/30/03), 864 So.2d 854, 857.

> In accepting a waiver of counsel, the trial court should advise the defendant of the nature of the charges, the penalty range for the charges, and the dangers and disadvantages of self-representation, such as the failure to recognize objections to inadmissible evidence and the inability to adhere to technical rules governing trials.  In addition, the court should inquire into the defendant's age, education, and mental condition and should determine according to the totality

of circumstances whether the accused understands the significance of the waiver.  *Bruce*, 864 So.2d at 857.

Whether a defendant has knowingly, intelligently, and unequivocally asserted the right to self-representation must be determined on a case-by-case basis considering the facts and circumstances of each case. *State v. Leger*, 05-11 (La. 7/10/06), 936 So.2d 108, 147-48, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007).  The trial court is given much discretion in determining whether the defendant's waiver was knowing and intelligent.  An appellate court should not reverse the trial court ruling absent an abuse of its discretion.  *State v. LaGarde*, 07-288 (La. App. 5 Cir. 10/30/07), 970 So.2d 1111, 1120, *writs denied*, 07-1650 (La. 5/9/08), 980 So.2d 684 and 07-2412 (La. 5/16/08), 980 So.2d 706.

Our review of the record in the present case reflects that the trial court conducted a very thorough colloquy with defendant before granting his unequivocal request to represent himself at trial.  During the October 9, 2019 *Faretta* hearing, the trial judge determined that defendant was fifty-five years old, was a construction foreman, graduated from high school, and had an associate's degree from classes offered by the Texas Department of Justice.  The trial court advised defendant that self-representation is "unwise and may be detrimental," and defendant indicated that he understood.  The following exchange then occurred:

THE COURT:

>You understand you are entitled to and will receive no special treatment by the Court?

MR. PATTON:

>No. I wasn't -- I wasn't aware of that, Your Honor, which was further discussions down the road later, but I guess go ahead.

THE COURT:

>Okay.  Do you understand that you must follow the technical rules of law, criminal procedure and evidence, et cetera, and you will be subject to the same rules that governor [sic] the attorneys?

MR. PATTON:

>Yes, I do understand that.

THE COURT:

You understand that the prosecution will be represented by an experienced professional attorney who will not go easy on you just because you are not a lawyer?

MR. PATTON:

I understand that.

THE COURT:

You understand you will receive no more library privileges than any other prisoner who represents himself?

MR. PATTON:

No, I don't understand that. That's not what *Faretta* says.

THE COURT:

It says you get library privileges, but you get the same library privileges as every self-represented litigant. You don't get more than other self-represented litigants. That's what it says.

MR. PATTON:

Well, what's a self -- what does a self-representation [sic] litigant get?

THE COURT:

What you're entitled to.

MR. PATTON:

Which is?

THE COURT:

I -- I mean, I can't give you an hour or a minute. I'm just telling you, you will get what every other self-represented litigant gets; you understand that?

MR. PATTON:

Go head [sic], sir. We'll -- we'll -- we'll -- we'll pursue that down the road. I'm going to cover that anyway.

THE COURT:

Okay. You understand you will have no extra time for preparation, no staff, or investigators?

MR. PATTON:

What do you mean?

THE COURT:

I mean, you -- you don't get publicly - appointed staff or investigators. You have to follow the same time periods provided in the Code of Criminal Procedure and you aren't allowed extra staff or investigators. That's what it means. Do you understand that?

MR. QUENIN:

If I may, your Honor?

\* \* \*

I've -- I've spoken with the director over at the Public Defender's Office and he has appointed an investigator --

MR. PATTON:

Yeah.

MR. QUENIN

-- on Mr. Patton's case. Now, how much time he is allotted for -- for this, I don't know. But the investigator and I intend to meet with Mr. Patton probably next week ---

\* \* \*

THE COURT:

So if the IDB is willing to provide an investigator, Mr. Patton, I guess you get that investigator, but the Court's not going to provide one; you understand that?

MR. PATTON:

I object to that, Your Honor.

THE COURT:

Okay.

MR. PATTON:

Because that's not – I've read almost all the pro se cases. Although there's none out of the Fifth Circuit and there's certainly none that the Supreme Court has decided, so I guess this is going to be a vehicle where I'm going to find out exactly what the Supreme Court says the pro se litigant can have his tools because I need the tools -- the same tools as a defense attorney and that's what the Tenth Circuit said, the Eighth Circuit, the Ninth Circuit, but we never had a ruling out of the Fifth Circuit, so I guess we will soon enough. I'm going to object to that, Your Honor. I'm going to take writs on -- on this -- on this issue.

Subsequent to this discussion about availability of resources, defendant

advised the court, in response to questioning, that he had given the issue of self-

representation much thought and had discussed it with other people. Defendant acknowledged that the charges are very serious and thereafter accurately recited the charges against him. The trial court then discussed the possible penalties with defendant, who indicated that he understood the consequences he faced and nonetheless wanted to represent himself. Following this lengthy colloquy, the trial court granted defendant's motion to represent himself and appointed Mr. Price Quenin of the Public Defender's Office as standby counsel.

Our review of the extensive colloquy between the trial court and defendant reflects that defendant was thoroughly advised of the dangers of self-representation including access to resources and equipment, that he understood those dangers, and that he nonetheless wished to represent himself. Accordingly, we find that defendant's waiver of his right to counsel was knowingly, intelligently, and voluntarily made, and the assertion of the right to represent himself was clear and unequivocal.

Furthermore, the record reflects that the trial court went to great lengths to ensure that defendant had appropriate resources and equipment to properly defend himself. In particular, the trial court addressed and accommodated defendant's requests for specified library time and for communicating with witnesses. Further, the judge gave defendant access to a computer in the courthouse to review discovery and DVDs and even provided defendant with technical assistance during trial if needed. In addition, the trial court addressed defendant's requests for an investigator, legal supplies, and expert witnesses, and determined that the Public Defender's Office would provide these resources to the extent needed.

Based on the foregoing, we find no abuse in the trial court's discretion in determining that defendant was competent to waive counsel and did so knowingly and voluntarily. In addition, throughout the entirety of the proceedings, the court

provided defendant appropriate resources and equipment in his efforts to defend himself. Accordingly, this assigned error is without merit.

**<ins>*PRO SE* ASSIGNMENTS OF ERROR</ins>**

***Assignment of Error Number Eleven – Actual Innocence***

On appeal, defendant challenges the sufficiency of the evidence used to convict him of rape, attempted rape, and sexual battery.[4] He asserts that he has consistently maintained his innocence and that DNA evidence supports his innocence. He further asserts that all evidence presented at trial, other than the perjured testimonies of two women, supports his version of events.

The constitutional standard for sufficiency of the evidence is whether, upon viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could find that the State proved all of the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Chinchilla*, 20-60 (La. App. 5 Cir. 12/23/20), 307 So.3d 1189, 1195, *writ denied*, 21-274 (La. 4/27/21), 314 So.3d 838, *cert. denied*, -- U.S. --, 142 S.Ct. 296, 211 L.Ed.2d 138 (2021). Under the *Jackson* standard, a review of a criminal conviction record for sufficiency of evidence does not require the court to ask whether it believes that the evidence at the trial established guilt beyond a reasonable doubt; rather, the reviewing court is required to consider the whole record and determine whether any rational trier of fact would have found guilt beyond a reasonable doubt. *State v. Jones*, 08-20 (La. App. 5 Cir. 4/15/08), 985 So.2d 234, 240.

In its determination of whether any rational trier of fact would have found the defendant guilty, a reviewing court will not re-evaluate the credibility of witnesses or re-weigh the evidence. *State v. Lane*, 20-181 (La. App. 5 Cir.

---

[4] When sufficiency of the evidence is challenged on appeal along with other assignments of error, the appellate court should look first to the sufficiency of the evidence. *State v. Hearold*, 603 So.2d 731, 734 (La. 1992); *State v. West*, 19-253 (La. App. 5 Cir 12/18/19), 285 So.3d 605, 609-10.

1/27/21), 310 So.3d 794, 804. The credibility of a witness, including the victim, is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. In the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. In sex offense cases, the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even when the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense. *State v. Clifton*, 17-538 (La. App. 5 Cir. 5/23/18), 248 So.3d 691, 703.

In the present case, defendant was convicted of attempted second degree rape, false imprisonment while armed with a dangerous weapon, second degree rape, and sexual battery. On appeal, defendant does not raise any issue relating to the sufficiency of the evidence with respect to the statutory elements of the offenses. Rather, defendant challenges the credibility of the victims and contends that the DNA results and the physical evidence introduced at trial support his version of events and contradict "the perjured testimonies of two women."[5]

Defendant first focuses on the DNA evidence, pointing out that the DNA recovered on J.M.'s vaginal swabs excluded him and that the analysis of the DNA sample collected from his penis excluded her. However, defendant misinterprets the testimony regarding the DNA results. At trial, Ms. Sitara Shirwani, a DNA analyst at the Jefferson Parish Sheriff's Office DNA Lab, testified, in accordance with the report issued, that an oral swab and an external genital swab from J.M. both tested positive for a protein found in high concentrations within seminal fluid.

---

[5] Since defendant does not raise any arguments relating to the sufficiency of the evidence with respect to the statutory elements, we find it unnecessary to discuss the evidence as it relates to each essential element in this opinion. *State v. Nelson*, 14-252 (La. App. 5 Cir. 3/11/15), 169 So.3d 493, 500 n.12, *writ denied*, 15-685 (La. 2/26/16), 187 So.3d 468. However, in light of *State v. Raymo*, 419 So.2d 858, 861 (La. 1982), we note that the State presented sufficient evidence under the *Jackson* standard to establish the essential statutory elements of the charged offenses.

22-KA-112                                    14

Ms. Shirwani testified that the waistband of J.M.'s blue underwear contained J.M.'s DNA and the DNA of a second individual that was too low to identify. Testing for suspected blood on the blue underwear confirmed that it was blood containing a mixture of at least two individual's DNA. That blood matched J.M.'s, and the second DNA present was not sufficient to obtain a profile. Thus, this DNA evidence did not specifically exclude defendant, as he claims, but rather contained insufficient quantities of DNA for identification.

Defendant also points outs that the photographs of his penis do not show any bite marks, which contradicts J.M.'s statement that she bit him. We do not agree with this assertion. While Detective Fisher stated that he did not see bite marks on defendant's penis, he testified that as he observed defendant undress, he noticed a red liquid that appeared to be blood in the genital area of his underwear.

Defendant further contests J.M.'s credibility based on the absence of gas residue on the underwear that J.M. allegedly left in the house. At trial, Chief Timothy Scanlan of the Jefferson Parish Sheriff's Office Crime Lab testified that testing a piece of evidence to see if it has remnants of CS gas is outside the scope of the lab's accreditation and that his lab would not perform such testing. Also, Ms. Shirwani, a DNA analyst, was asked if she saw "any contamination in any of the blood substances, in any of the clothes or anything" that she examined. She replied that she was not trained to know what that gas would look like and was not trained to be able to test if that gas was present. Thus, in light of the fact that the victim's underwear was not tested for CS gas, and no witness testified that the underwear did not have gas residue, defendant's claim that the lack of gas residue on her underwear casts doubt on J.M.'s credibility is also without merit.

Next, defendant attacks J.M.'s credibility based on her testimony that defendant held her at knife point and that she grabbed the knives with her bare hands to take it away from him, but the photographs of the victim's hands showed

no injuries consistent with her testimony and the search of the house did not reveal the knives described by her. At trial, Detective Fisher testified that he observed several knives inside defendant's residence but did not collect any because they did not have a blood-like substance on them. He noted that the kitchen had "plenty of knives" and that no bent knives were located. Detective Fisher indicated that knives were "all over the place," including laying on the counter. While the officers did not locate bent or bloody knives, the record reflected that defendant was alone inside his house for several hours before he left and his house was searched.

As to her injuries, Officer Norton identified photographs of J.M.'s injuries. He noted in part the following injuries shown in those photographs: a fresh cut on J.M.'s left hand, a laceration on her thumb, several smaller lacerations on her hand, and some swelling in her fingers. Officer Norton testified that J.M.'s injuries corroborated the information she provided. Sarah Mendoza, the nurse who performed the sexual assault examination, also testified that J.M. complained of "swelling and hand pain with cuts." Ms. Mendoza indicated that she observed cuts and swelling in J.M.'s fingers, discoloration in her hand, and two cuts to the palm. She also noted dried blood on J.M.'s hand and under her fingernails. Ms. Mendoza indicated that a cut to J.M.'s hand was consistent with somebody grabbing a knife blade. Based on the testimony of Officer Norton and Ms. Mendoza, the photographs of J.M.'s injuries did not contradict her testimony.

Further, defendant appears to argue that the jury should have believed him instead of the victims. The jury heard all testimony in this matter, including any inconsistencies therein, and made a credibility determination after listening to all of the testimony and considering all of the evidence. This Court should not second guess credibility determinations. *See Chinchilla*, *supra*.

Considering the law and the evidence admitted at trial, we conclude that a rational trier of fact, viewing the evidence in a light most favorable to the prosecution, could have found beyond a reasonable doubt that the evidence was sufficient under the standard set forth in *Jackson* to support defendant's convictions. Accordingly, we find defendant's arguments regarding his actual innocence are without merit.

**Assignment of Error Number One – Incomplete Record**

In his first *pro se* assigned error, defendant contends that he has been denied his constitutional right to appellate review because the trial court failed to provide him with a complete record.

La. Const. Art. I, §19 provides that no person shall be subjected to imprisonment without the right of judicial review based upon a complete record of all evidence upon which the judgment is based. In the present case, defendant asserts that the following portions of the record are missing: the hearing on the motion to sever on November 12, 2019; motion hearings on further testing for CS gas on June 3, 2020; *voir dire* on April 12 and 13, 2021; opening statements of the defense and prosecution on April 13, 2021; "important objections" made by defendant on April 21, 2021; defendant's trial testimony on April 21, 2021; and closing arguments on April 21, 2021.

We recognize that the record was missing some portions of the transcript when it was originally lodged in this Court. However, this Court subsequently ordered that the record be supplemented with the missing transcripts and thereafter afforded defendant an opportunity to review the entire record and file a supplemental brief based on a complete record. Accordingly, as defendant has been provided with a complete record, this assignment of error is without merit.

**Assignment of Error Number Two – State's Use of Perjured Testimony**

Defendant next contends that the prosecutor knowingly used perjured testimony to obtain his convictions, in violation of *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). Defendant specifically complains that the State allowed J.M. to testify falsely on several occasions and did not correct this testimony, despite physical evidence showing the testimony to be false. Defendant contends that this false testimony, as well as the tampering of evidence by police, calls into question the reliability of the entire case, and thus, his convictions and sentences must be vacated.

In *State v. Sparkman*, 13-640 (La. App. 5 Cir. 2/12/14), 136 So.3d 98, 112-13, *writ denied*, 14-477 (La. 11/26/14), 152 So.3d 897, this Court discussed a *Napue* violation as follows:

> In *Napue,* the United States Supreme Court held that, where a prosecutor allows a state witness to give false testimony without correction, a reviewing court must reverse the conviction if the witness's testimony reasonably could have affected the jury's verdict, even if the testimony goes only to the credibility of the witness. *Napue, 1*360 U.S. at 269, 79 S.Ct. at 1177.
>
> To prove a *Napue* claim, the defendant must show that the prosecutor acted in collusion with the witness to facilitate false testimony. *State v. Broadway,* 96–2659 (La.10/19/99), 753 So.2d 801, 814. Furthermore, fundamental fairness, i.e., due process, is offended "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue, supra.* When false testimony has been given under such circumstances, the defendant is entitled to a new trial unless there is no reasonable likelihood that the alleged false testimony could have affected the outcome of the trial. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). However, the grant of a new trial based upon a *Napue* violation is proper only if: (1) the statements at issue are shown to be actually false; (2) the prosecution knew they were false; and (3) the statements were material. *United States v. O'Keefe,*128 F.3d 885, 893 (5th Cir.1997).

We first note that defendant apparently did not object on this basis during J.M.'s testimony; thus, it has not been preserved for review. Moreover, even if properly preserved for review, defendant has not shown that J.M.'s testimony was

false and thus has failed to prove a *Napue* violation. In his *pro se* appellate brief, defendant notes several instances of allegedly false testimony by J.M.

In particular, defendant complains that J.M. testified falsely when she said that she bit defendant's penis, but the photographs of his penis showed no bite marks. The lack of visible bite marks on the photographs of defendant's penis does not establish that J.M.'s testimony that she bit his penis was false. While Detective Fisher stated that he did not see bite marks on defendant's penis, he testified that as he observed defendant undress, he noticed a red liquid that appeared to be blood in the genital area of his underwear.

Next, defendant asserts that J.M. testified falsely when she stated that she threw her underwear into the living room before leaving defendant's residence, but the lab test results showed no residue of CS gas on the underwear. As discussed in the previous assignment of error dealing with sufficiency of the evidence, the victim's underwear was not tested for CS gas, and no witness testified that the underwear did not have gas residue. Further, Detective Fisher's testimony at trial indicated that J.M.'s blue underwear was found in defendant's residence near the door. Thus, defendant has failed to prove that J.M. testified falsely about her underwear.

Defendant also alleges false testimony when J.M. testified that defendant held her at knife point and that she grabbed the knife with her bare hands to take it away from him, but the photographs of the victim's hands showed no injury consistent with her testimony and the search of the house did not reveal the knives described by her. As previously discussed in the assignment of error dealing with sufficiency of the evidence, the testimony at trial established that photographs of J.M.'s injuries were consistent with her version of events and did not contradict her testimony. Further, while the officers did not locate or recover bent or bloody knives during the search of defendant's residence, the testimony reflected that the

officers observed many knives inside the house and that defendant was alone inside his house for several hours before his house was searched.

Lastly, defendant complains that J.M. testified falsely when she said that defendant sent her a text asking if she had ever been with a black man, but the texts produced by the State did not reflect such a message. From a review of the testimony, it does not appear that J.M. testified definitively that defendant sent her a text asking if she had ever been with a black man. While J.M. did comment that defendant had asked her before whether she had ever been with a black man, her answer does not necessarily reflect whether that conversation was by text or phone.

Based on the foregoing, defendant did not prove that J.M.'s testimony was perjured or that the State knew of such perjured testimony. Accordingly, the arguments raised by defendant in this assigned error are without merit.

***Assignment of Error Number Three – Improper Institution of Prosecution***

In his next assigned error, defendant contends that he was denied his constitutional right to be charged by grand jury indictment.

The record reveals that the instant prosecution was instituted by bill of information, charging defendant with attempted second degree rape, in violation of La. R.S. 14:27 and 14:42.1 (count one); false imprisonment while armed with a dangerous weapon, in violation of La. R.S. 14:46.1 (count two); second degree rape, in violation of La. R.S. 14:42.1 (count three); and sexual battery, in violation of La. R.S. 14:43.1 (count four).

Article 1, § 15 of the Louisiana Constitution provides that no person shall be held to answer for a capital crime or a crime punishable by life imprisonment except on indictment by a grand jury. In addition, La. C.Cr.P. art. 382(A) provides that a prosecution for an offense punishable by death, or for an offense punishable by life imprisonment, shall be instituted by indictment by a grand jury. Other criminal prosecutions in a district court shall be instituted by indictment or by

information. *See State v. Bates*, 11-721 (La. App. 5 Cir. 3/27/13), 113 So.3d 411, 413.

At the time of the offenses, the penalty provisions for the offenses charged were not punishable by death or life imprisonment. Therefore, the State was authorized to institute prosecution by a bill of information. Further, in *State v. Brazell*, 17-32 (La. App. 4 Cir. 4/18/18), 245 So.3d 15, 28 n.9, *writ denied*, 18-868 (La. 3/6/19), 266 So.3d 900, *cert. denied*, --U.S.--, 140 S.Ct. 263, 205 L.Ed.2d 167 (2019), the appellate court recognized the following:

> The provision of the Fifth Amendment to the United States Constitution requiring prosecution "for capital, or otherwise infamous crime" to be instituted only by a grand jury indictment applies only to federal prosecutions and is not binding on the states. *Alexander v. Louisiana*, 405 U.S. 625, 636, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972) (citing *Hurtado v. California*, 110 U.S. 516, 538, 4 S.Ct. 111, 122, 28 L.Ed.2d 232 (1884)); *State v. Young*, 249 La. 609, 612, 188 So.2d 421, 422 (1966) ("[I]t is not a violation of the Federal Constitution for a State to provide for prosecution of an infamous crime by information when the constitution of the State authorizes that procedure.)

> Based on the foregoing, this assigned error is without merit.

***Assignment of Error Number Four – Denial of Right to Confrontation/Cross-Examination***

Next, defendant contends that he was denied his constitutional right to confrontation and cross-examination during the presentation of his case. He specifically contends that the trial court made numerous erroneous decisions to restrict his right to confrontation, to cross-examination, and to present a defense when it restricted defendant's questioning of several witnesses. Defendant gives numerous examples of these alleged violations and references the testimony of various witnesses. Defendant, however, has not provided any citations to the record when discussing these alleged violations. Rule 2.12.4(B)(3) of the Uniform Rules-Courts of Appeal provides: "The court may disregard the argument on an

assignment of error or issue for review if suitable reference to the specific page numbers of the record is not made."[6]

Nonetheless, we have thoroughly reviewed his arguments relating to the denial of his right to confront and cross-examine witnesses and to present evidence and find them to be without merit. The Sixth Amendment to the United States Constitution guarantees the right of the accused in a criminal prosecution "to be confronted with the witnesses against him." Additionally, the confrontation clause of the Louisiana Constitution directly affords the accused the right to "confront and cross-examine the witness against him." La. Const. art. I, § 16; *State v. Casey*, 99-23 (La. 1/26/00), 775 So.2d 1022, 1030, *cert. denied*, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).

Confrontation means more than being allowed to confront the witnesses physically. The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination. Cross-examination has been termed "the principal means by which believability and truthfulness of testimony are tested." *State v. Robinson*, 01-273 (La. 5/17/02), 817 So.2d 1131, 1135. Encompassed in the right of confrontation is the right of the accused to impeach a witness for bias or interest. *State v. Merwin*, 07-807 (La. App. 5 Cir. 4/15/08), 984 So.2d 842, 845. The Louisiana Code of Evidence permits a witness to be cross-examined on any matter relevant to any issue in the case, including credibility. *See* La. C.E. art. 611(B).

In addition, the trial court is empowered to exercise reasonable control over the manner of cross-examination so as to: (1) ensure the effectiveness of the interrogation as a mode of ascertaining the truth; (2) avoid needless consumption of time; and (3) protect witnesses from harassment or undue embarrassment. *See*

---

[6] Throughout his *pro se* appellate brief, defendant has failed to make suitable reference to the specific page numbers when setting forth his arguments.

La. C.E. art. 611(A).  Furthermore, a trial court's rulings as to the scope and extent of cross-examination should not be disturbed on appeal absent an abuse of the court's broad discretion.  *State v. Coleman*, 13-942 (La. App. 5 Cir. 5/14/14), 142 So.3d 130, 136, *writ denied*, 14-1224 (La. 1/23/15), 159 So.3d 1056.

We have reviewed defendant's numerous allegations regarding the denial of his right to confront and cross-examine witnesses and find no abuse of discretion in the trial court's rulings as to the scope and extent of defendant's questioning of these witnesses.  We emphasize that our review of the record reflects that the trial court gave defendant much leeway in the presentation of his case, including the questioning of witnesses.  The trial court went to great lengths to ensure that defendant had a fair trial; however, the trial court did exercise its discretion to curtail inappropriate and irrelevant questioning of the witnesses by defendant.

Furthermore, an error with respect to a defendant's right to confrontation is subject to a harmless error analysis.  *State v. Micelotti*, 07-808 (La. App. 5 Cir. 4/15/08), 984 So.2d 847, 854, *writ denied*, 08-950 (La. 12/12/08), 997 So.2d 559.  An error is harmless when the guilty verdict was surely unattributable to the error.  Whether an error is harmless in a particular case depends upon many factors, including the following: (1) the importance of the witness' testimony; (2) whether the testimony was cumulative in nature; (3) whether corroborating or contradictory evidence regarding the major points of the testimony existed; (4) the extent of cross-examination permitted; and (5) the overall strength of the State's case.  *State v. Luckey*, 16-494 (La. App. 5 Cir. 2/8/17), 212 So.3d 1220, 1230, *writs denied*, 17-432 (La. 10/27/17), 228 So.3d 1225, and 17-617 (La. 10/27/17), 228 So.3d 1234.  Appellate courts should not reverse convictions for errors unless the accused's substantial rights have been violated.  *State v. Coleman*, 142 So.3d at 139.

Reviewing defendant's complaints in light of these factors, we find that errors by the trial court in restricting defendant's questioning of witnesses, if any, were harmless. Based on the foregoing discussion, the arguments set forth by defendant in this assigned error are likewise without merit.

*Assignment of Error Number Five – Denial of Right to Testify*

In his fifth assigned error, defendant complains that he was denied his constitutional right to testify in his own behalf when the trial court severely limited his testimony. He points to the trial court's restriction of his testimony and specifically points out the trial court's alleged statement to him, "That's it, you're done testifying. We've heard enough." Defendant claims that the Supreme Court has determined that far less egregious behavior of the court infringes impermissibly on the right of a defendant to testify in his own behalf.

As recognized by both the federal and state constitutions, a criminal defendant's right to testify is fundamental. Specifically, the state constitution provides in pertinent part: "[a]n accused is entitled to confront and cross-examine the witnesses against him, to compel the attendance of witnesses, to present a defense, and to testify in his own behalf." La. Const. art. I § 16. Both state and federal jurisprudence recognize that "a criminal defendant's right to testify is fundamental and personal to the defendant" and the decision to "testify in one's own behalf" is "ultimately a decision for the accused to make." *State v. Hampton*, 00-522 (La. 3/22/02), 818 So.2d 720, 723, *on reh'g in part* (6/7/02). The U.S. Supreme Court has been "unequivocal" in holding that the U.S. Fifth, Sixth, and Fourteenth Amendments guarantee a defendant's right to testify. *Hampton*, *supra*; *State v. Doyle*, 21-257 (La. App. 5 Cir. 12/22/21), 335 So.3d 393, 415, *writ denied*, 22-167 (La. 4/5/22), 335 So.3d 836.

In the present case, we find no merit to defendant's argument that his right to testify in his own behalf was violated or restricted in any way. In fact, the trial

court gave defendant much leeway and allowed him to testify at length. Further, we cannot find support in the record for defendant's assertion that the trial court cut off his testimony. Accordingly, this assigned error is likewise without merit.

***Assignment of Error Number Six – Judge's Treatment of Defendant***

Next, defendant complains that he was denied his constitutional right to a fair trial because of the manner in which the trial judge treated him in front of the jury. Defendant contends that the trial court exhibited bizarre behavior, that he repeatedly reprimanded defendant in the presence of the jury, that he shouted at him on several occasions, that he cut him off during opening statements, cross-examination, and even while testifying in his own behalf. Further, defendant complains that the trial court threatened to forbid him from representing himself and held him in contempt in front of the jury. He contends that the trial court's inappropriate treatment of him prejudiced the jury against him and denied him of his constitutional right to a fair trial, and therefore, he is entitled to a new trial and vacation of his contempt charges.

A remark or conduct by the judge conveying an unwarranted reprimand of, or a severe criticism of the methods of, or discrimination against, accused's counsel, or an attack upon the motives of counsel with respect to particular conduct during the trial is improper. *State v. Anderson*, 333 So.2d 919, 921 (La. 1976). Disparaging remarks or intemperate criticism of defense counsel may constitute reversible error when such remarks adversely influence and prejudice a jury against a defendant. However, to amount to reversible error, the effect of the improper remarks must have contributed to the verdict, thereby denying defendant a fair trial. *State v. Boys*, 19-675 (La. App. 4 Cir. 5/26/21), 321 So.3d 1087, 1109, *writ denied*, 21-909 (La. 11/10/21), 326 So.3d 1245, and *cert. denied*, -- U.S. --, 142 S.Ct. 1672, 212 L.Ed.2d 580 (2022).

In the present case, having reviewed defendant's allegations against the trial judge and the entirety of the trial proceedings, we find no support in the record for defendant's assertions that the trial judge displayed inappropriate or bizarre behavior or that the trial court's admonishments prejudiced the jury against him. Rather, the record reflects that the judge attempted to shield the jury from his admonishments by generally hearing objections at the bench and asking defendant to lower his voice. Further, the admonishments and contempt pertain to defendant's conduct in the courtroom and his failure to follow the appropriate rules or directions. A review of the judge's comments in the record reveal an attempt by the trial judge to ensure that the trial proceeded in an orderly fashion and in accordance with the rules of court and the rules of evidence. Accordingly, the trial judge was justified in invoking his authority to maintain the integrity of his orders and proper conduct in the courtroom.

Accordingly, we find no merit to the arguments raised by defendant in this assigned error.

### Assignment of Error Number Seven – Improper Prosecutorial Remarks

In his seventh alleged error, defendant contends that the prosecutor made punitive remarks against him for exercising his right to represent himself, which remarks he alleges were extremely prejudicial and require reversal.[7] Defendant specifically complains about the prosecutor's comment during closing arguments that defendant's self-representation proves he is controlling. Defendant maintains that he could not object during this argument because the trial judge specifically instructed him not to object, and therefore, this Court should still review the issue even though he did not object.

---

[7] In his specified assignment of error, defendant sets forth that the prosecutor made punitive remarks against him; however, his argument on this issue only references one remark by the prosecutor.

Although defendant does not give a record cite for this specific complaint, it appears that he is referencing the following statement made by the prosecutor during closing arguments: "And you saw that his act of being pro se was his one last way to demean this woman, to have control and belittle them."

La. C.Cr.P. art. 774 provides:

> The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
>
> The argument shall not appeal to prejudice.
>
> The state's rebuttal shall be confined to answering the argument of the defendant.

A prosecutor has considerable latitude in making closing arguments. A conviction will not be reversed due to improper remarks during closing argument unless the reviewing court is thoroughly convinced that the remarks influenced the jury and contributed to the verdict. In making this decision, credit should be given to the jury's good sense and fairmindedness. *State v. Simmons*, 13-258 (La. App. 5 Cir. 2/26/14), 136 So.3d 358, 369, *writ denied*, 14-674 (La. 10/31/14), 152 So.3d 151.

In this matter, even assuming that the prosecutor's comment can be construed as prejudicial, we are not thoroughly convinced that the remark influenced the jury and contributed to the verdict. Accordingly, this assigned error is likewise without merit.

### *Assignment of Error Number Eight – Denial of Right to Impartial Jury*

Defendant next contends that he was denied his constitutional right to a fair trial with an impartial jury. Defendant argues that the pandemic made an impartial jury impossible, noting that many people who were summoned did not show up for jury duty, thereby depriving him of a fair cross-selection of Jefferson Parish residents. Defendant also complains that the trial court used the pandemic "to maliciously select a pro-prosecution jury of his choice." Further, defendant

contends that the trial court improperly denied his challenge for cause when a potential juror indicated she could not be impartial because she has two daughters.[8] Based on these issues with jury selection, defendant concludes that he was not given a fair trial.

The selection of a petit jury from a representative cross-section of the community is an essential component of the Sixth Amendment right to a jury trial. *State v. Brown*, 18-1999 (La. 9/30/21), 330 So.3d 199, 281, *cert. denied*, -- U.S. --, 142 S.Ct. 1702, 212 L.Ed.2d 596 (2022). The proper procedural vehicle for alleging that the general or petit jury venire was improperly drawn, selected, or constituted is a motion to quash. *See* La. C.Cr.P. art. 532(9). A motion to quash based on the ground that the petit jury venire was unconstitutionally drawn should be filed in writing prior to the beginning of the jury selection. *State v. Doyle*, 335 So.3d at 423.

Under La. C.Cr.P. art. 419(A):

A general venire, grand jury venire, or petit jury venire shall not be set aside for any reason unless fraud has been practiced, some great wrong committed that would work irreparable injury to the defendant, or unless persons were systematically excluded from the venires solely upon the basis of race.

The burden of proof "rests on defendant to establish purposeful discrimination in the selection of grand and petit jury venires." *State v. Holliday*, 17-1921 (La. 1/29/20), 340 So.3d 648, 691-92, *cert. denied*, -- U.S. --, 141 S.Ct. 1271, 209 L.Ed.2d 10 (2021).

Defendant also complains that the trial court improperly denied his challenges for cause. The grounds for which a juror may be challenged for cause

---

[8] Defendant alleges he would have shown more instances of the judge's abuse of discretion but claims that he was not afforded an opportunity to review the record of the jury selection. Although defendant did not have the *voir dire* transcripts at the time he submitted his *pro se* brief, this Court, upon noticing that defendant raised issues relating to jury selection, ordered that the record be supplemented with the *voir dire* transcripts. This Court thereafter provided defendant with these transcripts and afforded him an opportunity to file a supplemental brief by November 16, 2022. As of this date, defendant has not filed a supplemental brief.

are set forth in La. C.Cr.P. arts. 797 and 798. A trial court is vested with broad discretion in ruling on challenges for cause, and these rulings will be reversed only when a review of the *voir dire* record as a whole reveals an abuse of discretion. *Id.* at 676-77.

Having thoroughly reviewed the transcript of the *voir dire* proceedings and defendant's arguments, we find no merit to his claim that he was denied his right to a fair and impartial jury. With regard to defendant's complaint that he was deprived of a fair cross-section of Jefferson Parish residents, we note that defendant did not file a motion to quash raising this issue and apparently did not make an objection on this basis or object to the number of jurors who appeared for jury duty during the *voir dire* proceedings.[9] Thus, defendant failed to preserve this issue for appellate review. *See* La. C.Cr.P. art. 841. Further, defendant has made only a general argument that he was denied his right to a fair cross-section of Jefferson Parish residents and has given no indication as to which specific group has been excluded.

In addition, the record does not support defendant's assertions that the trial judge used the pandemic to "select a pro-prosecution jury of his choice," that the judge personally selected whom he did and did not want, and that the trial court improperly denied his challenges for cause. In particular, the record does not reflect that any of the potential jurors were excused for cause for improper reasons or that defendant voiced this objection about the trial court selecting a pro-prosecution jury in the trial court. With regard to defendant's specific argument that the trial court erred in denying his challenge for cause of the juror who stated she could not be impartial because she has two daughters, we note that defendant

---

[9] At one point, defendant asked for access to a phone during his lunch break because he "noticed something going on with the jury pool" that he might need to call someone about to assist him with a writ. Defendant did not expand on the matter at that time, and it does not appear that a writ pertaining to the jury pool or jury selection was filed with this Court.

did not provide a page cite to the record in support of this argument. Further, upon reviewing the *voir dire* transcripts, we noticed only one juror who talked about her two daughters, but the minute entry from the *voir dire* proceedings reflects that juror was "unused" because the jury panel was already complete.

Accordingly, we find no merit to defendant's argument that he was denied his right to a fair and impartial jury.

***Assignment of Error Number Nine – Denial of Motion for Testing***

Defendant contends that the trial court erred by not granting his motion for further testing on the State's evidence to determine the presence and amount of gas residue.

Prior to trial, defendant filed a motion requesting that the items recovered at 1308 Central Avenue be re-tested by the Jefferson Parish Crime Lab for amounts of and signs of CS gas residue. In his motion, defendant maintained that police planted evidence in his house and that both the blood evidence and the woman's underwear that were recovered should have been covered in this gas, which was deployed to get defendant out of the residence. At the June 3, 2020 pre-trial Zoom conference, the court discussed this motion. At that time, defendant indicated that he wanted to withdraw his request for the court to conduct a contradictory hearing and make a ruling on that motion because he did not want it to interfere with his right to a speedy trial.

In light of the fact that defendant withdrew his motion requesting such testing, this assignment of error is without merit.

***Assignment of Error Number Ten – Denial of Motion to Sever the Charges***

In this assigned error, defendant challenges the trial court's denial of his motion to sever the charges.

Prior to trial, defendant filed a motion for severance of offenses pursuant to La. C.Cr.P. art. 495.1, in which he asserted that the joinder of offenses would be

prejudicial because there are two alleged victims and a complete different set of facts, dates, and/or charges, and also that the joinder of the offenses would confuse the jury. At the November 12, 2019 hearing, defendant argued that the offenses from the two separate incidents should not be joined based on the following: the jury would be confused by the various counts and would not be able to separate the various charges or evidence; the jury would also be confused as defendant is presenting different defenses with regard to the two victims; the jury would infer guilt from both the charges; and the jury would be hostile to defendant because they would not understand all the different charges and different witnesses. After considering defendant's arguments, the trial court denied the motion for severance.

Defendant thereafter filed a writ application in this Court challenging the trial court's denial of the motion to sever. On January 31, 2020, this Court denied defendant's writ application, stating, in part, as follows:

> La. C.Cr.P. art. 493 provides that "[t]wo or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial." Relator is charged with four similar and/or related crimes, all felonies, against two victims, which fulfills the requirements of joinder under La. C.Cr.P. art. 493.
>
> La. C.Cr.P. art. 495.1 provides that "[i]f it appears that a defendant or the state is prejudiced by a joinder of offenses in an indictment or bill of information or by such joinder for trial together, the court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires." The transcript of the hearing of the motion, which was supplemented to this Court, reflects that the trial court considered relator's concerns, including his concerns about prejudice and jury confusion. The court noted that relator's concerns could be remedied by the participation of relator's stand-by defense counsel, whereupon the court denied the motion. Upon review, on the showing made, we find no abuse of discretion in the trial court's said ruling.
>
> Footnote omitted. *State v. Patton*, 20-K-27 (La. App. 5 Cir. 1/31/20) (unpublished writ disposition).

On appeal, defendant again challenges the trial court's denial of his motion to sever offenses. Defendant complains that the trial court denied his motion for severance without addressing any of the grounds cited by him in support of his motion, especially noting that the trial court did not consider the possibility of prejudice, which was required pursuant to La. C.Cr.P. art. 495.1.

Under the doctrine of "law of the case," an appellate court will generally decline to consider its own rulings of law on a subsequent appeal in the same case. *State v. Allen*, 17-685 (La. App. 5 Cir. 5/16/18), 247 So.3d 179, 185, *writ denied*, 18-1042 (La. 11/5/18), 255 So.3d 998. The law of the case doctrine is discretionary. Reconsideration of a prior ruling is warranted when, in light of a subsequent trial record, it is apparent that the determination was patently erroneous and produced unjust results. *State v. Falcon*, 13-849 (La. App. 5 Cir. 3/12/14), 138 So.3d 79, 87-88, *writ denied*, 14-769 (La. 11/14/14), 152 So.3d 877.

We find that there is no additional evidence in the subsequent trial record that would suggest that this Court's prior determination on this issue was patently erroneous or produced unjust results, and thus, we decline to reconsider this Court's previous ruling regarding the motion to sever offenses.

### Assignment of Error Number Twelve – Denial of Right to Counsel of Choice

Defendant contends that he was denied his constitutional right to counsel of his choice as a direct result of his former attorney's actions. Defendant specifically argues that he was unable to afford his counsel of choice because the previous counsel whom he fired, Martin Regan, refused to refund the $10,000.00 that defendant had paid him for his representation.[10]

---

[10] Defendant asserts that he fired Mr. Regan because he refused to investigate the case and prepare a defense, and that subsequent to Mr. Regan's withdrawal from the case, Mr. Regan lost defense evidence and refused to refund defendant's payment of $10,000.00.

The right to counsel is a fundamental constitutional right. The Louisiana Supreme Court has found that it is both structural error requiring reversal, and a violation of the Sixth Amendment, when a criminal defendant has been denied his right to retained counsel of choice. Generally, a person accused in a criminal trial has the right to counsel of his choice. However, an indigent defendant's right to choose his defense counsel only extends so far as to allow the defendant to retain the attorney of choice, if the defendant can manage to do so, but the right is not absolute and cannot be manipulated so as to obstruct orderly procedure in courts and cannot be used to thwart the administration of justice. *State v. Wilson*, 09-108 (La. App. 5 Cir. 12/29/09), 30 So.3d 149, 153.

In the present case, the record does not indicate that defendant was denied his counsel of choice. Defendant no longer wished to be represented by Mr. Regan and instead wished to represent himself. The trial court conducted a thorough hearing to make sure that defendant knew the dangers of self-representation and knowingly waived his right to counsel. Further, the record does not reflect who defendant wanted as his counsel of choice, nor does it reflect that he wished to hire other counsel prior to trial. Accordingly, there is no merit to this assigned error.

*Assignment of Error Number Thirteen – Errors Patent Review*

Defendant also requests that this Court review the record for errors patent in accordance with La. C.Cr.P. art. 920. Our review of the record reflects that the trial court failed to provide defendant with written notification of the sex offender registration requirements of La. R.S. 15:542 as required by La. R.S. 15:543(A). Accordingly, we remand the matter and order the trial court to inform defendant of the registration requirements of La. R.S. 15:542 by sending appropriate written notice to him within ten days of the rendition of this opinion and to file written proof in the record that defendant received such notice. *State v. Baskin*, 15-704

(La. App. 5 Cir. 3/30/16), 188 So.3d 470, 475, *writ denied*, 16-833 (La. 4/24/17), 220 So.3d 741.

## CONCLUSION

Accordingly, for the reasons set forth herein, we affirm defendant's convictions and sentences and remand the matter for correction of an error patent as noted herein.

## AFFIRMED AND REMANDED

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
INTERIM CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **DECEMBER 21, 2022** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 22-KA-112

**E-NOTIFIED**
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE STEPHEN C. GREFER (DISTRICT JUDGE)
PRENTICE L. WHITE                THOMAS J. BUTLER
DANE S. CIOLINO                  CLARE S. ROUBION

**MAILED**
HONORABLE PAUL D. CONNICK, JR.
DISTRICT ATTORNEY
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053